UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Bankruptcy No. 13 B 15811 |
| | ) | Chapter 7 |
| Timothy D. and Cecilia S. Krause, | ) | Judge Donald R. Cassling |
| | ) | |
| Debtors. | ) | |
| | ) | |
| National Union Fire Insurance | ) | Adversary No. 13 A 00901 |
| Company of Pittsburgh, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Timothy D. and Cecilia S. Krause, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

The Debtors are husband and wife and also co-owners of a general contracting business. They refinanced a short-term half-million dollar loan they had used for the purchase of raw land and the construction of a house thereon.   Telling the refinancing lender that the newly-constructed house was to be their primary residence, they were able to obtain a thirty-year mortgage (the "Mortgage") to secure repayment of a new promissory note (the "Note").   At the closing of the refinancing (the "Refi Closing"), the title insurance company failed to record the Mortgage.

Three months later, never having lived in the home themselves, the Debtors sold the property to another couple for almost $800,000.   At the closing of that transaction (the "Sale Closing"), the unrecorded Mortgage did not appear on the title insurance commitment, and the

settlement statement listed no amounts due and owing from the sellers to any lender. The only parties to or participants in the Sale Closing who were aware of the existence of the Note and unrecorded Mortgage were the Debtors themselves. As a result, they not only walked away from the Sale Closing with a sellers' proceeds check for almost $800,000, they kept walking. For more than three years, they failed to inform their lender that its collateral had been sold to a bona fide purchaser without notice of the Mortgage. Indeed, they actively concealed that fact from the lender by continuing to make monthly payments on a Note secured by a Mortgage on property they no longer owned. These facts only came to light when the Debtors suffered severe financial setbacks and defaulted on the Note and Mortgage.

In this adversary proceeding, the Plaintiff -- the lender's assignee[1] -- correctly points out that the bankruptcy discharge is reserved for honest but unfortunate debtors. It argues that the Debtors are not honest and that their misfortune is entirely of their own making. The Plaintiff therefore seeks to have the debt owed to it held nondischargeable on grounds of false representation or false pretenses (11 U.S.C. § 523(a)(2)(A)) and willful and malicious conversion (11 U.S.C. § 523(a)(6)).

In response, the Debtors point the finger at everyone but themselves, arguing that: (1) the title insurance company's failure to record the Mortgage rendered it utterly invalid; (2) only their wholly-owned company, Nevelco, Inc., should be bound by the Note and Mortgage that the Debtors both signed individually; (3) the Debtors are immune from liability for their actions

---

[1] The original lender and holder of the Note and Mortgage was Washington Mutual Bank, F.A. ("Washington Mutual"). The original title company, which was responsible for recording the Mortgage, was Stewart Title Company ("Stewart Title"). When Washington Mutual discovered that Stewart Title had failed in its obligation to record the Mortgage, it apparently made a claim against Stewart Title, which Stewart Title honored and paid. In return, Washington Mutual transferred title to the Note and Mortgage to Stewart Title. Stewart Title then asserted a claim against its own insurer, Specialty Title Services, Inc., which Specialty Title honored in turn. In return, Stewart Title conveyed title to the Note and Mortgage to Specialty Title. Specialty Title is thus the current assignee and holder in due course of the Note and Mortgage which are the subject of this adversary proceeding.

because they were only following the alleged advice of their attorney that the sale proceeds were theirs to keep because the Mortgage was unrecorded; (4) they never bothered to read any of the loan documents they signed, because that is what attorneys are for; and (5) as a result, they should not be bound by all the legal mumbo-jumbo contained in those documents, such as the "due-on-sale" clause requiring repayment of the loan upon sale or transfer of the collateral.

At trial, the Court had the opportunity to hear the testimony of both Debtors, as well as that of the attorney who represented them at the Sale Closing. The Court finds the Debtors' explanations and excuses implausible and their testimony belied by the contemporaneous documents they executed and by their actions prior to, during, and after the Sale Closing. The Court also concludes that their legal arguments are unconvincing and contrary to settled Illinois law. For the reasons set forth below, the Court concludes that the Plaintiff has met its burden and that the debt owed to the Plaintiff is nondischargeable under both § 523(a)(2)(A) and (a)(6).

## FACTS AND BACKGROUND

Operating through their wholly-owned company, Nevelco, Inc. ("Nevelco"), the Debtors conducted a general contracting business.[2] The Debtor Timothy D. Krause ("Mr. Krause") was president of Nevelco, and the Debtor Cecilia S. Krause ("Mrs. Krause") was its secretary. Husband and wife each owned a 50% interest in Nevelco. Mrs. Krause testified that she was responsible for Nevelco's bookkeeping, which included paying bills and balancing the books.

On September 10, 2004, Nevelco purchased a vacant lot at 205 S. Maple, Itasca, Illinois (Pl. Ex. No. 6) (the "Property") for $205,000, using financing from Itasca Bank & Trust. In

---

[2] Title to at least some of the homes Nevelco constructed was apparently held in a land trust at Itasca Bank & Trust Company ("Itasca Bank & Trust"), known as Trust No. 12022, which was formed on July 16, 2003. The beneficiary of Trust No. 12022 was Nevelco, and the trustee of Trust No. 12022 was Itasca Bank & Trust. (Pl. Ex. No. 5.)

3

Case 13-00901   Doc 43   Filed 04/30/14   Entered 04/30/14 17:20:11   Desc Main
Document   Page 4 of 23


2004, Nevelco conveyed title to the Property into Land Trust No. 12022. Although there was no testimony at trial that there was additional financing from Itasca Bank & Trust,[3] Plaintiff's Exhibit No. 9 is a November 5, 2009, HUD Settlement Statement listing additional sums lent to the Debtors, presumably for the construction of a house on the Property. That settlement statement indicates that the Debtors used the proceeds of a refinancing loan from Washington Mutual (described below) to pay off a balance of $570,506.28 owed to Itasca Bank & Trust.

The Debtors testified that, because the loan from Itasca Bank & Trust was a "construction" loan, it had a short term and needed to be refinanced. To that end, on November 9, 2005, the Debtors submitted a "Uniform Residential Loan Application" to Washington Mutual. (Pl. Ex. No. 8.) In that application, the Debtors sought a thirty-year "conventional loan" in the amount of $662,500 to be secured by a new mortgage on the Property. (*Id.*) Although the Debtors checked the box declaring the purpose of the loan to be a "Refinance," they never identified the borrower as Nevelco. (*Id.*) Instead, they signed the application only in their individual capacities, checking a box on the first page indicating the Property would be an "Investment" and checking a box on the second page representing that they "intend[ed] to occupy the property as [their] primary residence." (*Id.*) At trial, both Debtors testified that they listed both personal and business assets in the statement of assets and liabilities required by the application.

On November 8, 2005, the Debtors closed on the refinancing loan with Washington Mutual in the amount of $562,500 (the "Refi Loan"). (Pl. Ex. Nos. 9-14.) At the Refi Closing, the Debtors each executed the Note both individually and as "trustee," even though neither

---

[3] The Debtors did refer to the Itasca Bank & Trust loan in their testimony as a construction loan. The Court therefore assumes that there was an original loan from Itasca Bank & Trust for the purchase of the vacant land, followed by a subsequent loan from Itasca Bank & Trust that was used to build the house on the vacant property.

4

Debtor was a trustee of Trust No. 12022 (Pl. Ex. No. 10.)  Nevelco did not execute the Note, which, in fact, makes no reference at all to Nevelco.  (*Id.*)  The Debtors also executed the Mortgage both individually and "as trustee of a trust agreement date 7/16/03 known as Trust # 12022." (Pl. Ex. No. 11.)  As was the case with the Note, Nevelco did not execute the Mortgage, which also makes no reference at all to Nevelco.  (*Id.*)

Also at the Refi Closing on November 8, 2005, the Debtors each executed two riders to the Mortgage, once again executing them both individually and "as trustee of a trust agreement known as Trust No. 12022." (Pl. Ex. Nos. 12 & 13.)  And once again, Nevelco did not execute either rider and neither rider made any reference to Nevelco.  (*Id.*)  In addition, on November 9, 2005, the Debtors each individually signed a Truth-In-Lending disclosure statement.  (Pl. Ex. No. 14.)  Finally, on November 15, 2005, the Debtors each individually signed off on a payoff letter for Itasca Bank and Trust, loan no. 106313851, the construction loan which was being paid off from the proceeds of the Refi Loan. (Pl. Ex. No. 15.)

It is both significant to this case and undisputed that neither Washington Mutual nor Stewart Title recorded the Mortgage after the Refi Closing.

On February 14, 2006, just three months after the Refi Closing, and despite the Debtors' representations to Washington Mutual that they intended to reside permanently on the Property, Mr. Krause executed a Real Estate Sales Contract for the sale of the Property to Scott and Colleen Becker (the "Beckers").  (Pl. Ex. No. 16.)   He executed the contract in his capacity as president of Nevelco, thereby representing it to be the owner and seller of the Property.  The Sale Closing took place on March 13, 2006.  Mr. Krause attended with his attorney, Christopher Galloway ("Mr. Galloway").  Mrs. Krause did not attend.

5

From the date of the execution of the sale contract with the Beckers and continuing for over three years, the Debtors clammed up.   The Debtors neither requested nor obtained Washington Mutual's prior consent to the sale, as required by the Note and Mortgage.  (Pl. Ex. Nos. 10 & 11.)  Indeed, they neglected even to notify Washington Mutual of their intent to sell the Property.   Nor did the Debtors inform the title insurance company of the existence of the Mortgage on the property or of the underlying Note.   Prior to the Sale Closing, the Debtors did not even inform their attorney, Mr. Galloway, of the existence of the Note and Mortgage held by Washington Mutual.

Mr. Krause did testify that, immediately after the closing, he told Mr. Galloway about the outstanding Note and Mortgage held by Washington Mutual and that Mr. Galloway advised him that because the Mortgage was unrecorded, it was okay for the Debtors to retain all the proceeds of the sale and use them to pay other loans.   By contrast, Mr. Galloway testified that he could not recall ever having such a conversation with Mr. Krause and, moreover, that it would have been contrary to his normal practice and custom to give a client such advice under these circumstances because it could lead to charges of fraud and other liabilities for the client.

In any event, on March 14, 2006, the day after the Sale Closing, Mr. Krause deposited the title insurance company's check for the entire sales proceeds, $790,367.71, into Nevelco's account at Itasca Bank & Trust.  (Pl. Ex. No. 22.)  Two days thereafter, on March 16, 2006, the Debtors transferred $460,000 from the Nevelco account (see Pl. Ex. No. 42) to an AG Edwards account then titled in Mr. Krause's name.  Despite the fact that the depository account bore his name individually at the time of the deposit, Mr. Krause testified that the AG Edwards account was really a business investment account, and that he subsequently changed the name on that account to Nevelco to make that clear.   However, the fact remains, and was not refuted by

6

anything other than Mr. Krause's testimony described above, that within days of the Sale Closing, $460,000 of the sale proceeds were deposited into an account at AG Edwards titled in Mr. Krause's name individually.

For three years after the sale of the Property to the Beckers, the Debtors never breathed a word of it to Washington Mutual and certainly never used the proceeds of the sale to pay off the Refi Loan. Instead, for those three years, they dealt with Washington Mutual as if the sale had never taken place, by continuing to make monthly payments to Washington Mutual. (Pl. Ex. No. 40.) The last payment made to Washington Mutual on account of the Note was dated February 27, 2009, and was signed by Mrs. Krause in her capacity as an officer of Nevelco. (*Id.*)

Eventually, the Debtors were unable to continue making payments on the Washington Mutual loan, they defaulted on the Note in March 2009, and received a letter from Washington Mutual confirming that fact on May 6, 2009. (Pl. Ex. No. 24.) The parties agree that the current outstanding amount due under the note is $714,822.25.

### APPLICABLE STANDARDS

The bankruptcy discharge is the means by which the Bankruptcy Code provides a "fresh start" to debtors. *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992). The standard of proof required to establish an exception to the discharge of a debt is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *In re McFarland*, 84 F.3d 943, 946 (7th Cir. 1996). Exceptions to the discharge of a debt are to be construed strictly against a creditor and liberally in favor of a debtor. *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000).

7

## Section 523(a)(2)(A)

Section 523(a)(2)(A) of the Code enumerates the following specific, limited exceptions to the dischargeability of debts:

> (a) A discharge under section 727 . . . does not discharge an individual debtor from any debt --
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by --
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).

Section 523(a)(2)(A) thus provides for three separate grounds for dischargeability: false pretenses, false representation, and actual fraud. *Bletnitsky v. Jairath (In re Jairath)*, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001). False pretenses or a false representation are the two on which the Plaintiff bases its objection to the dischargeability of the debt in the present case. To except a debt from dischargeability on the grounds of false pretenses or a false representation, the Plaintiff must establish the following elements: (1) the Debtors made a false representation or omission of material fact; (2) that the Debtors (a) either knew to be false or made with reckless disregard for its truth and (b) made with an intent to deceive; and (3) the Plaintiff justifiably relied on the false representation. *See Reeves v. Davis (In re Davis)*, 638 F.3d 549, 553 (7th Cir. 2011); *Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010); *Wallner v. Liebl (In re Liebl)*, 434 B.R. 529, 538 (Bankr. N.D. Ill. 2010).

Any cause of action under § 523(a)(2)(A) -- whether based upon false pretenses, false representation, or actual fraud -- requires proof that the debtor acted with intent to deceive. *Pearson v. Howard (In re Howard)*, 339 B.R. 913, 919 (Bankr. N.D. Ill. 2006). Proof of intent is measured by the debtor's subjective intent at the time the representation was made. *CFC*

*Wireforms, Inc. v. Monroe (In re Monroe)*, 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004). Deciding whether a debtor had the requisite intent under § 523(a)(2)(A) is, therefore, a factual, subjective inquiry determined by examining all of the relevant circumstances, including those that took place after the debt was incurred. *6050 Grant, LLC v. Hanson (In re Hanson)*, 437 B.R. 322, 328 (Bankr. N.D. Ill. 2010); *see also Sears, Roebuck & Co. v. Green (In re Green)*, 296 B.R. 173, 179 (Bankr. C.D. Ill. 2003). "Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *Jairath*, 259 B.R. at 315.

### Section 523(a)(6)

For a finding of nondischargeability of a debt under § 523(a)(6), the Plaintiff must prove three elements by a preponderance of the evidence: (1) the Debtors caused an injury to the Plaintiff's person or property interest; (2) the Debtors' actions were willful; and (3) the Debtors' actions were malicious. *See First Weber Group, Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013); *Zamora v. Jacobs (In re Jacobs)*, 448 B.R. 453, 480 (Bankr. N.D. Ill. 2011).

The Seventh Circuit has held that a willful and malicious injury "is one that the injurer inflicted knowing he had no legal justification and either desiring to inflict the injury or knowing it was highly likely to result from his act." *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 324 (7th Cir. 2012). The term "injury" is "understood to mean a 'violation of another's legal right, for which the law provides a remedy.'" *Horsfall*, 738 F.3d at 774 (quoting *In re Lymberopoulos*, 453 B.R. 340, 343 (Bankr. N.D. Ill. 2011)). "The word 'willful' in [§ 523](a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).

9

The test for malice under § 523(a)(6) is (1) a wrongful act, (2) done intentionally, (3) which causes injury to the creditor, and (4) is done without just cause or excuse. *Park Nat'l Bank & Trust of Chi. v. Paul (In re Paul)*, 266 B.R. 686, 696 (Bankr. N.D. Ill. 2001) (*citing In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994). As to the malice element, conduct is "malicious" if it is taken "in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *Horsfall*, 738 F.3d at 774 (*citing Thirtyacre*, 36 F.3d at 700); *see also Jendusa-Nicolai*, 677 F.3d at 323.

To state a claim under § 523(a)(6), a creditor must allege conduct that amounts to an independent tort. *Oakland Ridge Homeowners Ass'n v. Braverman (In re Braverman)*, 463 B.R. 115, 119 (Bankr. N.D. Ill. 2011). A mere breach of contract is outside the scope of § 523(a)(6). *Id.*; *Wish Acquisition, LLC v. Salvino (In re Salvino)*, 373 B.R. 578, 589 (Bankr. N.D. Ill.2007), *aff'd*, No. 07 C 4756, 2008 WL 182241 (N.D. Ill. Jan. 18, 2008).

## DISCUSSION

### A. Section 523(a)(2)(A)

The Plaintiff argues that the Debtors made false representations under § 523(a)(2)(A) that caused Washington Mutual to give them a three-year "extension of credit" in the form of not accelerating its rights under the Note and Mortgage from the date of the sale to the Beckers in March 2006 until March of 2009. The Plaintiff further contends that the Debtors used false pretenses under § 523(a)(2)(A) when they concealed the sale of the Property to the Beckers, which enabled the Debtors to continue the financing arrangement with Washington Mutual and keep the sale proceeds for their own use.

The Court agrees that Washington Mutual granted the Debtors an "extension of credit" when it forbore from calling the loan upon the sale of the Property to the Beckers. An

"extension of credit" has been defined to include "'an indulgence by a creditor giving his debtor further time to pay an existing debt.'" *Bednarsz v. Brzakala (In re Brzakala)*, 305 B.R. 705, 711 (Bankr. N.D. Ill. 2004) (quoting *John Deere Co. v. Gerlach (In re Gerlach)*, 897 F.2d 1048, 1050 (10th Cir. 1990)). In order to establish a claim of forbearance induced by a false representation, a creditor "must demonstrate that it had valuable collection remedies at the time of the misrepresentation, that it did not exercise those remedies based upon the misrepresentation, and that those remedies lost value during the extension period." *Goldberg v. Ojeda*, 417 B.R. 59, 65 (N.D. Ill. 2009), *aff'd sub nom. Ojeda v. Goldberg*, 599 F.3d 712 (7th Cir. 2010) (*quoting Bremer Bank v. Wyss (In re Wyss)*, 355 B.R. 130, 136 (Bankr. W.D. Wis. 2006)). Accordingly, § 523(a)(2) protects creditors who have been deceived into forbearing from pursuing collection efforts. *Id.*

Under similar facts, the Court of Appeals for the First Circuit found an extension of credit took place when the creditor was induced not to accelerate a mortgage based on a debtor's misrepresentations. *See Field v. Mans*, 157 F.3d 35 (1st Cir. 1998). "While [a] concealed sale was not technically a new 'agreement' concerning the existing credit, it triggered legal rights under the existing credit agreement which markedly altered the credit relationship between the parties." *Id.* at 43. By deceiving the creditor into continuing a credit arrangement it had the right to terminate, the debtor in that case tricked the lender into making "an extension of credit." *See id.* Similarly, in this case, because Washington Mutual could have called the Note had it known the truth, the Debtors' failure to disclose the sale of the Property to the Beckers for three years after the Sale Closing led Washington Mutual to extend credit that it otherwise would or could have stopped.

11

The parties do not dispute that the Note and Mortgage provide for acceleration of the loan upon transfer of the encumbered Property. (Pl. Ex. Nos. 10 & 11.)  Nor do they dispute that Washington Mutual did not exercise its right to accelerate the loan because it was unaware that the Property had been sold.  The Court therefore finds that the sale of the Property triggered legal rights under the existing credit agreement, altering Washington Mutual's rights thereunder and constituting an extension of credit to the Debtors under § 523(a)(2)(A).

In order to except a debt from discharge under § 523(a)(2)(A), the Plaintiff must also prove that the Debtors made a false representation that led to the extension of credit.  An omission to state a material fact may constitute a false representation. *See Health Benefit Plan v. Westfall (In re Westfall)*, 379 B.R. 798, 803 (Bankr. C.D. Ill. 2007) (stating that "[a] debtor's silence regarding a material fact can constitute a false representation under § 523(a)(2)(A).") There is no dispute that the Debtors did not inform Washington Mutual, the Beckers, Mr. Galloway, or the title insurance company's closing agent that there was an outstanding Mortgage on the Property at the time it was sold in March 2006.  Nor is there any dispute that the reason Washington Mutual did not exercise its acceleration rights under the Mortgage in March of 2006 was that the Debtors did not inform it that the Property had been sold.

The Debtors argue there was no false representation because they legitimately believed they were not required to inform Washington Mutual of the sale and they were entitled to keep the sale proceeds.  They testified that they believed these things because they considered the Note and Mortgage to have been improperly executed, and therefore invalid, and also because the Mortgage was nullified by not having been timely recorded.  In support of this argument, the Debtors both testified that Nevelco was the actual borrower from Washington Mutual, that they

12

executed the loan documents merely in their capacities as officers of Nevelco, and that they never intended this to be a loan for their personal use.

On their faces, the Note and Mortgage both contradict the Debtors' testimony. The signature pages of these instruments identify Mr. Krause and Mrs. Krause individually as the borrowers and mortgagors: Conspicuous by its absence on the signature pages, or anywhere else in the Note and Mortgage, is the name Nevelco, Inc. Likewise, the Debtors' signatures are unaccompanied by phrases such as "by its President: . . . " or "by its Secretary: . . . ," or any other wording that would indicate that the Debtors were acting in their capacities as corporate officers when they executed these instruments.[4] The inescapable conclusion is that the Debtors executed these instruments, and assumed all the attendant obligations thereunder, in their capacities as individuals. The same analysis applies to the execution of the two riders to the Mortgage, (Pl. Ex. Nos. 12 & 13) and to the truth-in-lending statement (Pl. Ex. No. 14). All were executed by the Debtors individually without any hint that they were acting as agents of Nevelco.

The Debtors' attempt to deflect liability under the Note and Mortgage solely to Nevelco is further undermined by their representation in the loan application that they intended to reside in the house that they had constructed on the lot. No business purpose for the purchase of the home was asserted.

The Court therefore rejects as totally lacking in credibility the Debtors' testimony that they executed the loan documents solely in their capacity as officers of Nevelco and not in their

---

[4] Even after the November 8, 2005 Refi Closing, the Debtors continued to sign documents relating to the loan from Washington Mutual in which they acknowledged that they had borrowed the money from Washington Mutual as individuals, rather than as officers of Nevelco. For example, on November 15, 2005, the Debtors each individually executed a payoff letter for Itasca Bank & Trust, which used the proceeds of the Washington Mutual loan to pay off the prior construction loan of Itasca Bank & Trust. (Pl. Ex. No. 15.) Therefore, the Court finds that the Mortgage was valid and binding between the Debtors in their individual capacities and Washington Mutual.

individual capacities.  Instead, the Court finds that the Debtors executed the Note and related loan documents in their individual capacities, represented to Washington Mutual that they intended to reside in the home located on the Property and, on the strength of that representation, obtained a thirty-year term for the loan.  (Pl. Ex. No. 8.)

Further, the Court finds that the Mortgage itself conclusively establishes that the Debtors certainly intended, at the time they obtained the financing from Washington Mutual, that the Property would serve as collateral for repayment of the Note under the terms of the Mortgage. Under the Illinois Supreme Court's decision in *Haas v. Sternbach*, 156 Ill. 44 (1894), the lender's failure to record a mortgage does not render the mortgage or the underlying note invalid or unenforceable, at least as between the original parties to the loan:

> "We are aware of no principle, outside of self-interest and prudence in business, that requires the holder of a mortgage to put it on record at any particular time. By not doing so promptly, he runs the risk of having it postponed to junior liens, and even of losing the benefit of it altogether.  As to subsequent purchasers and creditors without notice, such securities take effect from the time of filing for record only."  The correctness of this statement of the law in view of our statute cannot be seriously questioned.  No one will contend that the recording of a mortgage is, in this state, necessary to its validity.  Recording such instruments serves but one purpose, and that is to make them valid as against creditors and subsequent purchasers without notice.  Section 31, c. 30, Rev. St. provides that they shall take effect as to such persons from the time of filing for record, and not before.  No time is fixed within which the filing for record must take place in order to give such an instrument validity.

156 Ill. at 54 (quoting *Field v. Ridgely*, 116 Ill. 424, 431 (1886)).

In this case, no rights of third parties are adversely affected by a decision finding this debt nondischargeable.[5]  Instead, the only parties affected are the parties to the loan itself (or their successors or assigns).  Accordingly, the principles set forth in *Haas* clearly apply, and the

---

[5] By contrast, this Court's decision in *In re Arnold*, 483 B.R. 515 (Bankr. N.D. Ill. 2012) also followed *Haas* but reached the opposite conclusion on the merits because the rights of subsequent third-party creditors were squarely affected by the decision in that case.

Court rejects as a matter of law the Debtors' contention that it was not obligated under the due-on-sale clause of the Mortgage because it was not timely recorded. No other evidence adduced at trial demonstrates that the underlying loan documents were otherwise invalid.

The Court therefore finds that the Debtors made false representations (in part, in the form of an omission to state a material fact) under § 523(a)(2)(A) by: (1) telling Washington Mutual that they intended to use the loan proceeds to build a house in which they would live; (2) failing to inform Washington Mutual when the Property was thereafter sold; and (3) failing to disclose to the title insurance company the existence of the outstanding Note and Mortgage affecting the subject Property.

Next, the Plaintiff must establish that the Debtors knew the representation to be false or that they made it with reckless disregard for its truth, and that it was made with the intent to deceive. At trial, Mr. Krause testified that he did not understand that he was required to inform Washington Mutual when the Property was sold. He testified that with respect to the four or five other homes that Nevelco had built and sold, there were two that were sold without the mortgage loan being paid off. But as to those two properties, he testified that Nevelco secured lines of credit the terms of which did not include a due-on-sale clause. By contrast, the loan documents in this case do not indicate that the Washington Mutual loan was in the form of a line of credit for Nevelco's general business use.

For her part, Mrs. Krause testified that *every* prior loan obtained by Nevelco had been paid off when the property was sold. When asked whether the loan from Washington Mutual was an exception to this uniform practice, Mrs. Krause simply chose not to respond to the question. The Court infers from Mrs. Krause's failure or refusal to respond to this question that,

15

like Mr. Krause, she was aware of the Debtors' obligation to pay off the loan at the Sale Closing or, at a minimum, that the sale should have been disclosed to the lender, Washington Mutual.

Mr. Krause also testified that even though he had not reviewed either the seller's closing statement prepared by Mr. Galloway or the settlement statement, he had a definite expectation as to the amount of his proceeds. He anticipated receiving sale proceeds of about $230,000, well short of the more than $790,000 that he actually received. Mr. Krause testified that, in the parking lot immediately after the Sale Closing, he told Mr. Galloway that there was an outstanding loan from Washington Mutual with a Mortgage on the Property. He claimed that Mr. Galloway informed him that, because there were no liens on the property, Washington Mutual was just a general creditor and that "we [the Debtors] should pay our loans." According to Mr. Krause, Mr. Galloway told him that "the money was ours." By contrast, Mr. Galloway testified that he could not recall ever having such a conversation with Mr. Krause and, moreover, that it would have been contrary to his normal practice and custom to give a client such advice under these circumstances because it could lead to charges of fraud and other liabilities for the client.

Based on its observation of both witnesses and consideration of the many other instances in which Mr. Krause's testimony was belied by contemporaneous documents and by his own actions, the Court finds Mr. Galloway's testimony to be credible on this point and finds Mr. Krause's testimony to the contrary not to be credible. Specifically, the Court rejects as not believable Mr. Krause's testimony that Mr. Galloway informed him that he could keep all of the proceeds from the sale without using them to pay off the Refi Loan.

The Court's credibility determination on this issue is further supported by Mr. Krause's reaction to receiving this windfall. At trial, he did not express surprise, or guilt, or a desire to

return the windfall, even though he knew or should have known that he owed over half a million dollars to Washington Mutual. Instead, he testified his reaction upon receiving the windfall was merely that this was "a business day for us." Nor did the passage of time change either Debtor's attitude. Despite having received a windfall of over half a million dollars more than they had anticipated, the Debtors did not inform Washington Mutual of the sale for over three years, nor did they ever make any effort to remit the windfall to Washington Mutual. Instead, the Debtors actively concealed the fact of the sale by continuing to make monthly payments on the Note for over three years after the Sale Closing. The Debtors offered only a tautological explanation in support of this pattern of concealment -- Mrs. Krause testified that she continued to make payments for Nevelco on the loan because they were bills for Nevelco that she had paid and continued to pay.

Moreover, even if Mr. Galloway had given this advice to the Debtors, the Court would reject the Debtors' defense that they should be shielded from liability because of their reliance upon advice of counsel: "This defense undermines the basic principle that the law should generally be adhered to despite any bad advice not to comply with it." *Crawley v. United States (In re Crawley)*, 244 B.R. 121, 130 (Bankr. N.D. Ill. 2000). As the Seventh Circuit has stated: "[P]eople who sign tax returns omitting income or overstating deductions often blame their accountant or tax preparer. But these arguments never go anywhere. People are free to sign legal documents without reading them, but the documents are binding whether read or not." *Novitsky v. Am. Consulting Eng'rs, LLC*, 196 F.3d 699, 702 (7th Cir. 1999). Therefore, the Court rejects the Debtors' defenses that they are shielded by the alleged advice of their counsel and that they did not in fact read the loan documents they signed.

The Plaintiff suggests that the only reasonable inference from the Debtors' overall pattern of conduct is that they wished to conceal from Washington Mutual the fact that they had pocketed the proceeds of the sale of the Property without retiring the Washington Mutual debt. The Court agrees that this is the most logical and reasonable inference from a review of the Debtors' entire course of conduct and therefore finds that the Debtors intentionally continued to make these payments in order to conceal the sale of the Property, prevent Washington Mutual from accelerating the terms of the Note and Mortgage, and retain the entire amount of the sale proceeds for their own use.

The record supports the conclusion that, at the time of the Sale Closing, the Debtors had enough experience with the kind of financing necessary to conduct their general contracting business to understand their obligations under the due-on-sale clause in their Mortgage and therefore knew that they were required to disclose the sale to Washington Mutual. The Court finds that they purposely did not do so in order to retain the full amount of the sale proceeds and that these actions establish an intent to deceive as contemplated by § 523(a)(2)(A).[6]

Finally, for a finding of nondischargeability of a debt under § 523(a)(2)(A), the Plaintiff must establish that it justifiably relied on the false representation. *Field v. Mans*, 516 U.S. 59, 74-75 (1995). Justifiable reliance requires only that the creditor did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* at 71 (internal quotation omitted). Whether a party justifiably relies on a misrepresentation is determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff, not by using an objective standard.

---

[6] At trial, Mrs. Krause testified she was responsible for raising four sons and that she was ill while conducting the bookkeeping work for Nevelco. The Court has considered this testimony but finds that it does not negate the overwhelming evidence establishing the intent to deceive on both Debtors' parts, including particularly her execution of monthly mortgage checks to Washington Mutual for three years after the Becker Sale had taken place.

*Id.*; *Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002).

To satisfy the reliance element of § 523(a)(2)(A), the creditor must establish that the debtor made

a material misrepresentation that was the cause-in-fact of the debt that the creditor seeks to have

excepted from discharge. *Mayer v. Spanel Int'l Ltd. (In re Mayer)*, 51 F.3d 670, 676 (7th Cir.

1995).

The Court finds that the Debtors' failure to disclose the sale of the Property was a

material misrepresentation and the cause in fact of Washington Mutual's extension of credit and

continuance of the financing arrangement with the Debtors. In examining the circumstances of

the instant matter, the Court finds that because the Debtors continued to make payments on the

Mortgage for three years after selling the property to the Beckers, Washington Mutual was

justified in relying on the misrepresentation that its loan was still secured by the Property. The

Court further finds that, without notice of the sale, Washington Mutual would have had no

reason to exercise its right under the Mortgage to accelerate the loan before the Debtors' conduct

came to light in 2009. The Court therefore finds that Washington Mutual's reliance on the

Debtors' false representation in failing to disclose the sale of the Property was justifiable as

required by § 523(a)(2)(A).

In short, the Court finds that the Plaintiff has met its burden of establishing that (1) the

Debtors made a false representation, (2) they knew it was false at the time it was made, (3) they

made it with the intent to deceive, and (4) the Plaintiff justifiably relied on the misrepresentation.

Accordingly, the Court finds that the debt to the Plaintiff is nondischargeable under §

523(a)(2)(A).

## B. Section 523(a)(6)

In this case, the Plaintiff has alleged willful and malicious conversion of its property. In order to establish conversion, the Plaintiff must show that the Debtors exercised intentional control or taking of property belonging to another, without the other's consent, which resulted in the serious interference with the other's right to possess its property. *See Horsfall*, 738 F.3d at 773.

In order to except a debt from discharge under § 523(a)(6), the Plaintiff must establish that the Debtors caused an injury to the Plaintiff's property interest and that the Debtors' actions were willful and malicious. As previously stated, in order to state a claim under § 523(a)(6), the Plaintiff must allege conduct that amounts to an independent tort. *See Braveman*, 463 B.R. at 119. Here, to assert a claim under § 523(a)(6), the Plaintiff has alleged a willful and malicious conversion of property.

Under Illinois law, a claim for conversion is established when the Plaintiff proves: "(1) an unauthorized and wrongful assumption of control, dominion, or ownership by a person over the property of another; (2) plaintiff's right in the property; (3) plaintiff's right to immediate possession of the property; and (4) a demand by plaintiff of possession thereof." *Schaul v. Ludwig (In re Ludwig)*, 13 B 32960, 13 A 1345, 2014 WL 1304037, at * 6 (Bankr. N.D. Ill. April 2, 2014) (citing *Eggert v. Weisz*, 839 F.2d 1261, 1264 (7th Cir. 1988)); *see also Van Diest Supply Co. v. Shelby Cnty. State Bank*, 425 F.3d 437, 439 (7th Cir. 2005).

The Mortgage defined Washington Mutual's rights in the Property, and the due-on-sale clause gave Washington Mutual an immediate right to the proceeds (to the extent of the balance due under the Note) of any sale of the Property. (Pl. Ex. Nos. 10 & 11.) It is undisputed that, instead of remitting the proceeds of the Becker sale to Washington Mutual, Mr. Krause deposited

those funds into a Nevelco account and thereafter caused Nevelco to transfer $460,000 of that amount into an AG Edwards account titled in Mr. Krause's name. The Court finds that by retaining the full amount of the sale proceeds, the Debtors exercised an unauthorized and wrongful assumption of control, dominion, or ownership of Washington Mutual's property.

After the Debtors failed to make three consecutive mortgage payments, Washington Mutual notified the Debtors by letter dated May 6, 2009 (Pl. Ex. No. 24) that they were in default, and that Washington Mutual was exercising its right to accelerate payment of the Note. The Court finds that this notification constitutes an explicit "demand" and that the Plaintiff has therefore proven all the elements of a conversion action under Illinois law.

A finding of nondischargeability under § 523(a)(6) also requires the Court to determine that the conversion was willful and malicious: "Willfulness requires 'a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury.'" *Horsfall*, 738 F.3d at 774 (quoting *Kawaauhau v. Geiger*, 523 U.S. at 61). *Geiger* did not hold that all state law intentional torts, like conversion, are willful for purposes of § 523(a)(6). *Id.* Rather, "'[w]illfulness' can be found either if the debtor's motive was to inflict the injury, or the debtor's act was substantially certain to result in injury." *Id.* (quoting *Bukowski v. Patel*, 266 B.R. 838, 844 (E.D. Wis. 2001).

In this case, the Court finds that the Debtors' injury to Washington Mutual -- the conversion of its property -- was accomplished through a series of deliberate and purposeful acts: failing to notify Washington Mutual of the sale of the Property; failing to reveal the existence of Washington Mutual's Mortgage to anyone involved in the sale; retaining the full amount of the sale proceeds rather than paying off the Note; depositing the funds into the Nevelco account; transferring a substantial portion to a personal account in Mr. Krause's name; and concealing from Washington Mutual the disposition of the Property by continuing to make monthly

21

mortgage payments. As previously discussed, the Court rejects Mr. Krause's testimony that he did not know that he was required to inform Washington Mutual of the sale of the Property. The Debtors' actions over a period of more than three years were, at the very least, substantially certain to result in the conversion of Washington Mutual's property, and, more likely, intended to inflict that injury. The Court therefore finds that these actions were willful under § 523(a)(6).

Finally, the Court finds that the Debtors' actions were malicious and committed without just cause or excuse. Maliciousness does not require specific intent to do harm, but it does require that the debtor's actions were taken in conscious disregard of one's duties or without just cause or excuse. *Horsfall*, 738 F.3d at 775. The Debtors' duties pursuant to the due-on-sale clause of the Mortgage were to notify the mortgagee upon sale or transfer of the Property and to pay off the Note on demand. The Debtors' disregard of those duties was blatant. Far from notifying Washington Mutual of the sale, they actively concealed it by maintaining the pre-sale status quo of making monthly payments for three years. The proceeds of the Becker sale were more than sufficient to pay off the Note at the Sale Closing. Indeed, Mr. Krause testified that Nevelco still had sufficient funds in its accounts in 2006 and 2007 to retire the debt in full. Yet far from discharging this duty, the Debtors simply pocketed the cash. The excuses offered by the Debtors for their conduct -- that the unrecorded Mortgage did not bind them, that Nevelco was the true borrower and mortgagor, that their attorney gave them bad advice, that they did not read or understand the documents they signed -- have already been addressed and rejected by the Court. As for any just cause for their actions, the Court finds none. The Court finds that the Debtors' actions were malicious under § 523(a)(6).

The Court therefore finds that the Debtors deliberately converted Washington Mutual's property in order to use the funds for their own purposes. The Court finds that these actions

were both willful and malicious under § 523(a)(6).  Accordingly, the Court finds that the debt to

the Plaintiff is nondischargeable under § 523(a)(6).

<strong>CONCLUSION</strong>

For these reasons, the Court finds that the debt owed to the Plaintiff in the amount of

$714,822.75 is nondischargeable under § 523(a)(2)(A) and (a)(6).


<strong>ENTERED:</strong>


**DATE:** *April 30, 2014*                    *Donald R. Cassling*

<strong>Donald R. Cassling<br>United States Bankruptcy Judge</strong>